The TORO COMPANY, Plaintiff,

v.

TEXTRON, INC., Defendant.

Civ. A. No. 78–50.

United States District Court,
D. Delaware.

Sept. 5, 1980.

Rudolf E. Hutz, and Paul E. Crawford, of Connolly, Bove & Lodge, Wilmington, Del., Robert T. Edell, and Earl D. Reiland, of Merchant, Gould, Smith, Edell, Welter & Schmidt, Minneapolis, Minn., for plaintiff.

David A. Anderson, of Potter, Anderson & Corroon, Wilmington, Del., Dugald S. McDougall, and Keith V. Rockey, Chicago, Ill., Arthur J. Hansmann, Racine, Wis., for defendant.

## OPINION

STAPLETON, District Judge:

Plaintiff, The Toro Company ("Toro") and defendant Jacobsen Manufacturing Company ("Jacobsen")[1] are competitors in the manufacture and sale of labor–saving machines for outdoor use by consumers. Toro's amended complaint in this action charges Jacobsen with making and selling snow throwers that infringe Toro's Patent No. 3,359,661 (the " '661 patent") and with competing unfairly with Toro by issuing false and misleading advertisements. This Opinion constitutes the Court's findings of fact and conclusions of law after a trial on the merits.

## I. THE PATENT INFRINGEMENT CLAIMS.

Toro charges that Jacobsen's snow thrower infringes four claims of the '661 patent: Claims 19, 33, 4 and 15. Jacobsen contends in response that each of these claims is invalid under Section 103[2] and is, in any event, not infringed by its machine.

### A. Claim 19.

Claim 19 of the '661 patent claims the principal features of the alleged invention. Specifically, it claims:

A snow plow comprising:

an upstanding rear wall means generally transverse of the normal direction of travel,

---

1. As used herein "Jacobsen" refers to the Jacobsen–Textron division of defendant Textron, Inc.

2. Jacobsen also attacks the '661 patent on grounds of double patenting. A structure incorporating the elements of the claims of the '661 patent could be made, however, which would not infringe the designed patents to which Jacobsen has referred the Court. Under the law of this·Circuit that fact is fatal to the double patenting defense. *Wahl v. Rexnord, Inc.*, 624 F.2d 1169 (3d Cir. 1980).

impeller means mounted forwardedly of said wall means for rotation about a horizontal transverse axis for throwing snow rearwardly and upwardly along a front face of said wall means,

a plurality of generally vertically disposed horizontally spaced vanes defining with said rear wall means a plurality of forwardly open chute means,

said chute means being in close relationship with the impeller means and directly receiving snow into the chute means and discharging snow therefrom upwardly from substantially the entire forward vertical length of the open chute means, and means for varying the snow directing attitude of said vanes.

### 1. Background Information And The Circumstantial Evidence Bearing On Obviousness.

The early 1950's saw the first efforts to sell snow throwers to homeowners. The products then offered as alternatives to the snow plow and snow shovel were primarily what is known in the industry as two stage snow throwers: the first stage consisting of augers which gathered and transported the snow to the middle of the machine and the second stage consisting of some kind of impeller which discharged the collected snow. Toro marketed such a two stage snow thrower commencing in 1950 under the trade name Snow Hound.

Two stage snow throwers were effective snow removers but tended to be heavy (and thus not easily maneuvered) and expensive. In 1962 or 1963 Toro assigned a three man team, headed by Ralph W. Speiser, the task of developing a new lightweight snow thrower which could be marketed as "motorized snow shovel." The machine designed by this team (the "Speiser snow thrower") led to the filing of the application for the '661 patent on June 30, 1964 and its issuance on December 26, 1967.

The Speiser snow thrower was a single stage machine which utilized a down–milling paddle wheel as an impeller. This paddle wheel extended the full width of the machine and impelled snow rearwardly and upwardly against a back wall mounted transversely to the normal direction of travel. The snow was then discharged through a plurality of flexible vanes which controlled the direction of discharge. The Speiser machine was first marketed in the 1964–1965 season under the trade name SNOW–PUP. At the time of the invention of the Speiser snow thrower there were a few single stage machines on the market but these utilized an auger to gather and discharge the snow and, like the two stage machines, tended to be heavy and expensive. While the record does not reveal whether there was a single stage, paddle wheel machine on the market in 1964, there were a number of such snow throwers described in the prior art.[3]

Toro has marketed the Speiser machine with some modifications[4] since 1964. At the same time it has continued to market a line of more expensive and more powerful two stage machines. In 1974, for example, its line of two stage snow throwers went from 8 horsepower machines weighing 287 pounds and selling in the $520 range to a 5 horsepower machine weighing 225 pounds and selling in the $380 range. Toro, at the same time, was marketing a 14″ SNOW–PUP weighing 22 pounds and selling for approximately $130 and a 21″ SNOW–PUP weighing 27 pounds and selling in the $145 range.

The marketplace received the Speiser machine cautiously. Toro analyzed the problem as a "credibility gap". It seemed that distributors and dealers, as well as homeowners, refused to believe that the SNOW–PUP would be an effective and durable snow remover. As one Toro official put it,

---

3. *E. g.*, the Erickson patent issued in August 1955, the Rubin patent issued in January 1960, and the Phelps patent issued in January 1963.

4. As will be discussed hereafter, the means for altering the curvature of the vanes and, accordingly, the direction of discharge was modified substantially. I do not believe this or the other minor modifications had any significant impact on the market experience of the *Speiser* machine, however.

it looked "something like a plastic toy and that is what they called it in the hardware stores in the early days of its introduction". (Tr. 55).

In the first ten years of marketing its single stage snow throwers Toro's national sales fluctuated up and down from a low of about 17,500 units in the fiscal 1966 season to a high of about 34,400 units in fiscal 1974. Fiscal 1975 and 1976 started an upward trend showing modest gains to 55,000 units and 76,500 units respectively. In the 1976–77 season Toro mounted the biggest snow thrower advertising campaign in its history. During that year over a million dollars was spent on advertising. (PX 209). Sales increased sharply and the next year Toro engaged in another aggressive advertising effort. (PX 209). Sales literally "took off", rising from 157,684 units in 1977 to 557,672 units in 1979. It is important to note, however, that this "sales explosion" involved more than only the Speiser machine. While Toro sales of its single stage snow thrower were going from 76,633 units in 1976 to 557,672 units in 1979, its share of the single stage market was going from 70% to 54%. Thus, the single stage market during this period was growing at a rate higher than that of Toro sales.[5] The record suggests that this phenomenon was produced by increased public familiarity with single stage machines and by heavy advertising and promotion.

## 2. *The Prior Art And Claim 19.*

Prior to 1952, the art was devoted to snow removal equipment of various kinds for use by governmental and commercial enterprises. From 1952 to 1962 this record discloses approximately fifteen patents pertaining to snow removal machines designed for homeowners to use in clearing driveways and sidewalks.

Turning to Claim 19 of the '661 patent, the closest single piece of prior art is United States Patent No. 2,871,585, issued to Merry on February 3, 1959 (DX 37N), a patent which the examiner of the '661 patent apparently did not consider. The Merry patent taught a hand–guided snow thrower with a down–milling paddle wheel impeller which swept snow backward and upward against a rear wall disposed transversely to the normal direction of travel. Moreover, Merry's snow thrower discharged snow forwardly, to either the left or right side via a discharge chute which was totally open–i. e., unobstructed–in the forward direction. It incorporated a single flexible vane which the user could cause to form a curved surface diverting the upwardly and forwardly impelled snow to one side or the other.

The only difference between the Merry snow thrower and the machine described in Claim 19 is that Claim 19 calls for a plurality of vanes for directing the snow rather than a single vane.[6]

There were at least two other prior art hand–guided snow throwers which utilized a paddle wheel impeller to sweep snow against a curved backplate in the same manner as the '661 machine. The Erickson thrower, embodied in United States Patent No. 2,714,772 issued in 1955 (DX 37K), and the Phelps thrower, shown in United States Patent No. 3,074,189 (DX 37Q), utilized this approach but discharged the snow through enclosed, rather than forwardly open, discharge chutes.

In addition, several prior art references taught the use of several adjustable vanes in tandem to guide the discharge of the snow. (DX 37I; DX 37J, Figs. 5 and 6; DX 37X, Fig. 2). Of particular interest is the

---

**5.** By 1978, Toro was interested in developing a new single stage snow thrower because "many competitors . . . [were] entering the market". (PX 117).

**6.** There is an additional difference between Merry's machine and the snow thrower illustrated in the *figures* of the '661 patent. Merry's impeller means, unlike that of the illustrated machine, did not consist solely of a paddle wheel extending a full width of the rear wall.

Rather, the wheel used a narrow, centrally located paddle wheel flanked on both sides by rotating augers which gathered snow and moved it into the path of the fast turning paddles. Claim 19 of the '661 patent, as contrasted with its figures, is broad enough to embrace any type of impeller and Merry's auger–paddle wheel device clearly comes within the meaning of the word impeller as used in the '661 patent.

Borg snow thrower which utilized a discharge chute having a series of vanes rigidly fastened at their base ends and ganged together at their upper ends for deflection in tandem just as in the machine illustrated in the '661 patent.

### 3. The Level Of Ordinary Skill In the Pertinent Art.

■ The parties disagree as to whether there is evidence in the record bearing on the level of ordinary skill in the pertinent art. Clearly, there is little direct evidence. The nature of snow throwers, however, is itself circumstantial evidence which permits the Court to say something about the skill of those involved in designing such apparatus and in solving the problems presented by that task. At a minimum the designing of a snow thrower requires knowledge of the rudimentary principles of mechanical engineering, whether that knowledge be acquired by formal training or experience. Given the view I take of this matter, nothing more need be said about the level of ordinary skill in the art.

### 4. The Obviousness Issue.

As previously noted each of the principal features of the snow thrower claimed in Claim 19 of the '661 patent–a down–milling paddle wheel impeller; a curved back wall; a plurality of snow–directing flexible vanes which, together with the back wall define forwardly open discharge chutes, and a means for varying the snow directing attitude of the vanes–is found in the prior art. Indeed, except for the fact that it had a single, snow–directing, flexible vane rather than a plurality of such vanes, the Merry patent taught all of these features in a single source. Accordingly, the question posed is whether an artisan having a grasp of at least the rudimentary principles of mechanical engineering would find it obvious to substitute a plurality of flexible, snow–directing vanes in the Merry design for its single flexible snow–directing vane.

This inquiry must be undertaken with the following admonition of the Third Circuit Court of Appeals in mind:

The patent bar read *Graham* as adopting a more liberal view toward patentability, and as moving away from the invention concept treated in *Hotchkiss v. Greenwood* [11 How. 248, 52 U.S. 248, 13 L.Ed. 683] supra, and *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950). In two later cases, however, *Anderson's–Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 61, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969), and *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 279, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976), the [Supreme] Court reiterated that constitutional limitations, which find expression in the invention concept, restrict patentability. The Court also had some special words about patents utilizing a combination of elements known in the prior art:

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. . . . A patent for a combination which only unites old elements with no change in their functions . . . obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. . ."

*Sakraida v. Ag Pro, Inc.*, supra at 281, 96 S.Ct. at 1537, quoting *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*, supra [340 U.S.] at 152–53, 71 S.Ct. 127 [at 130].

Thus, the courts, in determining obviousness in a combination patent, must undertake the tripartite *Graham* inquiry without losing sight of the necessity to determine whether the device performs its function in an innovative fashion.

*Sims v. Mack Truck Corp.*, 608 F.2d 87, 90–91 (3d Cir. 1979).

Claim 19 claims a combination of old elements each of which performs exactly the same function it performed in the prior art references. If substitution of a plurality of vanes be an improvement on the Merry design, it is clearly an alternative for increasing control of the discharge that would have occurred to anyone likely to have been

assigned the task of designing a snow thrower.[7] In short, the evidence shows convincingly that Claim 19 is void for obviousness.

This conclusion is not contrary to the limited circumstantial evidence in this record which bears on the issue of obviousness. While Toro relies heavily upon the evidence of what it considers to be the phenomenal commercial success of the Speiser machine, in context I do not find that evidence to be particularly helpful in answering the question of whether one skilled in the art in 1962 would have found the structure of Claim 19 obvious from the prior art.

■ When a patented invention experiences significant commercial success, it may be appropriate to infer that there has been a need in the marketplace, that others have been seeking unsuccessfully to meet that need, and, accordingly, that the patented invention is non–obvious. The probative value of evidence of commercial success, however, like that of all other circumstantial evidence depends upon the overall context and must be assessed in light of all the evidence, direct and circumstantial. Here, for example, the commercial success occurred some fifteen years after the alleged invention and this fact alone makes it an unsure predicate for an inference about the presence or· absence of inventive activity during the period immediately preceding the patentee's successful work. The record further suggests, for example, that homeowners were not yet ready to give up their shovels for equivalent powered equipment in the 1950's and early 1960's, and Toro may have been the only entity (or one of only a few) with both the foresight to anticipate the potential for such a market and the assets necessary to open and develop it. If so, it would not be surprising to find few attempting the task assigned to the Speiser group.

It is true that the prior art shows some activity in the hand–guided snow thrower area during the 1950's and early 1960's, but the patents pointed to by Toro do not suggest a substantial commitment of industry resources to the development of the powered shovel concept. Moreover, the key concept of a forwardly opened discharge to prevent clogging does not appear in the art until the Merry patent was issued in 1959. Accordingly, only activity following that time would be of significant probative value.

■ In summary, application of the "primary" test of non–obviousness in this case dictates a conclusion that Claim 19 is invalid. While the conclusion would prevail even in the presence of circumstantial evidence suggesting a contrary conclusion,[8] the circumstantial evidence in this case is entirely consistent with this resolution.

### B. *Claim 33.*

Claim 33 embodies all of the limitations of Claim 19 of the patent with the added requirement that the machine have a pair of transversely oriented handles, which permit the snow thrower to be "swung in a manner similar to a conventional hand shovel". Since Claim 33 is dependent on Claim 19, it must perish for the same reasons.[9]

### C. *Claim 4.*

Claim 4 of the '661 patent is the claim in suit which relates to the mechanism by which the vanes of the patented machine were shifted from side to side. It begins with the elements described in Claim 19 and adds a lengthy description of a "means for laterally deflecting said vanes". If the claim defines anything novel, the novelty must reside in that one "means", since all the rest is old art. Suffice it to say that if this "means" language be construed broadly enough to cover a means for shifting the vane mount like that utilized by Jacobsen— that is a crank or lever mounted on a rotary shaft—it would, to that extent, cover a

---

7. The same may be said of the substitution of a paddle wheel for the paddle wheel plus auger approach of the Merry design.

8. *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

9. The two handle construction was, in any event, old in the snow thrower art. *See* DX 37Y, a 1955 Rototiller publication.

means clearly taught in the prior art. The means used in the Jacobsen machine was depicted in the Meyer Canadian Patent issued in 1946 which claimed a snow thrower with flexible, snow directing, vanes whose position was altered by manipulation of an identical shaft and crank apparatus. (DX 37X).[10] Thus, Claim 4 of the '661 patent, as read by Toro, defines nothing more than a prior art snow thrower equipped with a prior art vane shifting mechanism. Since the combination of the two prior art elements would be obvious to the artisan looking for a way to alter the position of the flexible vanes, Claim 4 violates Section 103 and is invalid.

### D. *Claim 15.*

Claim 15 also begins with language calling for a snow plow with a rear wall, an impeller, and a plurality of spaced vanes. The claim then goes on to describe a mechanical arrangement for attaching the vanes to the machine frame (referred to in the claim as the "supporting structure"). Specifically, this arrangement is described as follows:

> attachment means for mounting said vanes on said supporting structure,
>
> said attachment means comprising a slot in said supporting structure,
>
> and a detent carried by said vane and insertable through said slot, said detent being adapted after being inserted through said slot to secure the vane to its supporting structure.

Toro reads the word "detent" to refer to a tab–like portion of the vane which is inserted into a slot in the supporting structure and is then "adapted" to prevent withdrawal. Jacobsen on the other hand reads the word "detent" to refer to a plastic protuberance, shown in Fig. 3, on the side of the vent tab which, after being forced through the slot in the housing, expands to

10. This patent was not considered by the Patent Office in connection with the '661 application.

11. Column 3, line 65, *et seq.*

12. *See* Claims 14 through 16.

13. It follows that Jacobsen attachment means —i. e. tabs which are inserted through the slots

prevent withdrawal of the tab. While the "detent" is used on one occasion in the specifications to refer to something "formed" in the tab rather than to the tab itself,[11] its use in the context of the claims referring to attachment means [12] leads me to the conclusion that "detent" in Claim 15 means the tab which extends rearwardly from the back of the vane. Thus, Claim 15 claims a snow plow with the principal features of Claim 19 and with its vanes attached to the machine structure by means *of a tab which is inserted in a slot and capable of being adapted to prevent withdrawal.*

It is not surprising to find that tabs adaptable, after insertion in slots, to prevent withdrawal were not new in the early sixties. It is surprising to find only one example of this kind of attachment means in the record of this case. That one example, however, provides an adequate basis for concluding that such attachment means were found in the prior art and that one skilled in the art, when faced with the problems of attaching plastic vanes to the housing of a snow thrower, would have found it obvious in the early sixties to try this solution.[13]

There is no question that the Hamilton patent shows an attachment means consisting of a tab which is adaptable, after insertion in a slot, to prevent withdrawal. Indeed, it shows the identical attachment means shown in Fig. 3 of the '661 patent— one where the adaptation is a protuberance on the tab which compresses during insertion and assumes its normal configuration preventing withdrawal thereafter. Toro argues, however, that the Hamilton patent, being addressed as it is to the structure of a back rest for a chair made with metal tubing and sheet metal, is "nonanalogous art".

and whose withdrawal is prevented by a rod passing through a hole in the tab—comes within the description of the attachment means in Claim 15. Since I also find that the Jacobsen machine discharges snow "from substantially the entire forward vertical length of the open chute means", it follows that Claim 15, as well as Claim 19, would be infringed if valid.

Its argument is based upon the view that Hamilton was working "in the chair art" while Speiser, et al. were working in the snow thrower art.

Toro's argument is fundamentally flawed. When defining the relevant prior art, it is not the differences or similarities between various arts that are important. Rather the relevant inquiry relates to the relationship between the problem which the inventor of the patent–in–suit was attempting to solve and the problem to which any prior art reference is directed.[14] Here the problem addressed in Claim 15 was how to attach two relatively rigid members at right angles, securely, and presumably in as simple and as light weight a manner as possible. This is precisely the problem which Hamilton addressed.

The only reason it seems somewhat artificial to speak of a designer with knowledge of the rudimentary principles of mechanical engineering looking to a source like the Hamilton patent for help is the fact that the tab and slot approach would obviously occur to such an artisan without any external stimulus. Courts which have been confronted with similar situations have uniformly overruled the "nonanalogous art" argument of the patent holder. In *Skee-Trainer, Inc. v. Garelick Mfg. Co.*, 361 F.2d 895, 898 (1966), for example, the Eighth Circuit held:

> We conclude . . . that "prior art" . . . with respect to a simple mechanical device utilizing universally known principles permits referring to the field of mechanics itself.[15]

Equally appropriate is the observation of the Sixth Circuit in *Detachable Bit Co. v. Timken Roller Bearing Co.*, 133 F.2d 632, 637 (6th Cir. 1943):

. . . While it is true that patents have frequently been sustained where mechanical expedients were derived from non--analogous arts and so not obvious, this has not been true where what was borrowed was a common and generally known expedient in mechanical arts. *American Mine Door Co. v. Newberry*, 4 Cir., 3 F.2d 435, 436; *Lempco Products, Inc. v. Timken--Detroit Axle Co.*, 6 Cir., 110 F.2d 307 . . .[16]

I conclude that it would have been obvious to utilize the attachment means illustrated by the Hamilton patent in designing the Speiser snow thrower. Since the other features of that machine were also old art, Claim 15 is invalid for obviousness. Judgment will be entered for the defendant on all of plaintiff's patent infringement claims.

## II.  THE UNFAIR COMPETITION CLAIMS.

### A. The Facts And Contentions.

In counts two through five, respectively, of its amended complaint, Toro charges Jacobsen with unfair advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); common law unfair competition; common law disparagement, and violation of Delaware's Uniform Deceptive Trade Practices Act, 6 Del.C. § 2531, *et seq.*, in the advertising of its Sno--Burst snow thrower.[17] In particular, Toro claims that Jacobsen engaged in unfair practices in conjunction with a comparative advertising campaign begun in 1978 and conducted by use of newspaper and magazine advertisements and films distributed for dissemination to snow thrower dealers and ultimate purchasers. The representations made in those advertisements, according to Toro,

---

14. *See, e. g., Geo. J. Meyer Mfg. Co. v. San Marino Electronic Corp.*, 422 F.2d 1285 (9th Cir. 1970).

15. *See also Cathodic Protection Service v. Am. Smelting, Etc.*, 594 F.2d 499 (5th Cir. 1979).

16. *See also Compton v. Metal Products, Inc.*, 453 F.2d 38 (4th Cir. 1971) and *Monroe Auto Equipment Co. v. Heckethorn Mfg. & Supply Co.*, 332 F.2d 406 (6th Cir. 1964).

17. Toro concedes that "the elements of each of these causes of action are essentially similar", and has not addressed them separately either at trial or in its briefing. I have concluded that, in this case, Toro is entitled to no greater relief for common law unfair competition or disparagement or for violation of the Deceptive Trade Practices Act than for violation of the Lanham Act. Accordingly, I shall limit my discussion to the Lanham Act claim.

were false, misleading, and deceptive, and disparaged Toro's Snow Master machine. Toro seeks an injunction prohibiting Jacobsen from making such claims in the future, a mandatory injunction requiring Jacobsen to disclaim its allegedly false and deceptive comparative claims in its future advertising, treble and punitive damages, and attorneys' fees. Jacobsen responds that Toro is not entitled to relief because the representations made in its comparative advertising either are true or have not been shown by Toro to be false; because, even if Toro is able to show that Jacobsen has made misrepresentations, those misrepresentations constitute "puffing" which is not actionable, and because, in any event, Toro has failed to demonstrate that it has been injured by those representations. The comparative claims to which Toro objects were set forth most concisely in Jacobsen's print advertisement (PX 40) set out in the margin.[18]

1. RESERVE POWER. The "power burst" feature of the Sno–Burst snow thrower enables the engine on the Jacobsen machine to run at two speeds. Toro argues that Jacobsen's claim that the power burst helps prevent stalling in heavy drifts is false and deceptive. In support of this assertion Toro points out that the Sno–Burst owner's manual (PX 508) cautions against use of the Jacobsen machine in snow higher than six–eight inches; that Gary Polk, a Toro engineer who tested the power burst feature, found it did not help prevent stalling in drifts (DX 304, pp. 21–22), and that Gary Steingraber, Jacobsen's product engineer responsible for the Sno–Burst, believed a two–speed engine was an unnecessary feature because a user would have little occasion to run the machine at the lower speed (PX 273). In response, Jacobsen cites additional testimony by Mr. Polk to the effect that the power burst feature may, under some circumstances, provide an extra increment of power in a drift. (DX 303, p. 172).

2. ENGINE SIZE. Toro claims that the Jacobsen comparative advertisement makes two representations with respect to engine size, (1) that the engine in the Sno–Burst can generate three horsepower, and (2) that the Jacobsen engine is significantly more powerful than the engine in the Toro snow thrower. Toro asserts that both of these representations are made without any basis in fact. In support of this contention Toro relies on tests conducted by its employees on six Jacobsen engines, none of which produced more than 2.29 horsepower (PX 46; DX 142). In addition, Toro points out that in tests conducted by its employee on two Toro and two Jacobsen engines according to the accepted industry guideline for measur-

18. PX 40 comprises the following advertisement:

# THE NEW JACOBSEN
## YOU GET MORE TO SELL.

| COMPARE: | THE TORO SNOW MASTER | THE NEW JACOBSEN SNO-BURST | THE SNO-BURST ADVANTAGE BECOMES YOUR SALES ADVANTAGE |
|---|---|---|---|
| Reserve Power | No reserve power. | Unique Power Burst™ feature gives instant surge of extra power. | Power Burst helps prevent stalling in heavy drifts. |
| Engine Size | 2¼ HP | 3 HP | The Sno-Burst has the biggest engine in its class. |
| Prime to Start? | Yes. | No. | No priming means easier, faster starting |
| Gas/Oil Ratio | 32:1 | 50:1 | Higher ratio gives smoother running, less smoking. |
| Wheel Size | 6" diam | 7" diam. | The Sno-Burst is easier to push, simpler to maneuver. |
| Snow-Throwing Distance | Up to 15 feet. | Up to 18 feet. | Those extra 3 feet mean the Sno-Burst really gets snow out of the way in a hurry. |
| Fuel Tank Capacity | 1 quart. | 2 quarts. | Fewer refueling stops, less time spent out in the cold. |
| Auger Housing | Plastic | Aluminum | Aluminum's more rugged, more durable. |
| Handle | Fixed | Adjustable | The Sno-Burst's handle adjusts to the individual. |
| Warranty | One-year limited. | Two-year limited. | A longer warranty builds customer confidence. |

Note: All data taken from manufacturer's current published specifications

Jacobsen's film cassettes contain similar comparative claims.

ing the horsepower of small engines, both Toro engines proved more powerful than the Jacobsen engines. (DX 142). Jacobsen admits that its engine does not generate three horsepower when mounted on a snow thrower for actual use by a consumer. Nonetheless, it denies that its claim of three horsepower is either false or deceptive because, it maintains, its engine can generate that much power on the test stand. (DX 314; 325). It also denies that the claim gives a distorted message with respect to the difference in power between the Toro and the Jacobsen engine. Similar tests run on the Toro engine, it claims, showed that the Toro engine developed a maximum power of 1.88 horsepower at 4000 r. p. m. in contrast to 2.50 horsepower for the Jacobsen engine. (DX 314; 182). Finally, in light of the failure of the Toro engine to develop 2.25 horsepower, Jacobsen argues that Toro is prevented by its own unclean hands from complaining about Jacobsen's engine size claims.

3. PRIME TO START? Jacobsen's comparative advertising claims that the engine on its Sno–Burst snow thrower starts without priming, unlike the engine on Toro's Snow Master, and hence, that it is easier to start than the Toro. Toro's challenge to the veracity of this claim is two-pronged. First, it alleges that a procedure which amounts to priming is recommended by the Sno–Burst owner's manual to accomplish easier starting. (PX 508). Second, it contends, in a consumer comparison survey conducted by it a majority of respondents found the Toro snow thrower easier to start than the Jacobsen. (PX 48). Jacobsen responds that the procedure it recommends for starting its engine does not constitute priming and that many consumers find the Jacobsen engine easier to start.

4. GAS/OIL RATIO. The Jacobsen engine uses a gas–to–oil ratio of 50:1 as opposed to the 32:1 ratio used by the Toro engine, and Jacobsen's comparative advertisements claim that its higher ratio causes its engine to run smoother and smoke less. In challenging these claims Toro relies on the testimony of its engineer, Mr. Polk, who stated that a higher gas–to–oil ratio, in and of itself, does not enable one engine to run

smoother or smoke less than another. (DX 304, pp. 32–33). Jacobsen answers that this claim is truthful and that, whether it is or not, Toro is estopped from saying otherwise since it made a similar representation when it increased its gas–to–oil ratio from 16:1 to 32:1 (DX 243).

5. WHEEL SIZE. In connection with a comparison of wheel sizes, Jacobsen's advertising asserts that its machine is "easier to push, simpler to maneuver." Toro asserts that in consumer tests conducted by it the two machines proved equally maneuverable while the Toro machine was found to be easier to push. (PX 48). Additionally, it argues, Jacobsen was aware of tests conducted by the John Deere Company which demonstrated that no more force was required to operate the Snow Master than the Sno--Burst. (PX 144). In defense of its claim Jacobsen cites the deposition testimony of Toro employees who, it alleges, testified, respectively, that larger wheels may enable a snow thrower to negotiate bumps more easily (DX 302, pp. 80–82), and that larger wheels might make the machine more maneuverable. (DX 306, pp. 74–75).

6. AUGER HOUSING. The Sno–Burst's auger housing is aluminum; the Snow Master's is plastic. Jacobsen claims that aluminum is "more rugged, more durable". Toro points out that Jacobsen lacks any empirical support for this claim and that, in impact tests conducted by Toro, both materials performed satisfactorily though the aluminum housing on the Jacobsen machine was "physically blemished" at the test's conclusion. (PX 58). Jacobsen responds, first, that Toro itself switched from plastic to metal wheel mounting brackets in part to provide increased durability (DX 301, p. 10) and, second, that Toro's test though showing the two materials to be equally rugged and durable under the test conditions, does not resolve the question whether plastic or aluminum is a more rugged, more durable material for a snow thrower housing.

7. HANDLE. Jacobsen's handle is adjustable to two positions with a vertical difference in height of 1⅜". The print advertisement claims that the Sno–Burst, un-

like the Snow Master, "adjusts to the individual". The film cassette distributed to dealers describes the adjustability of the Jacobsen handle as "[a]nother example of a feature based on thoughtfulness and care for the customer . . . and his back." (PX 42). Toro does not dispute that the Sno–Burst handle adjusts, but it argues that, in light of the minimal amount of adjustability, the claim is deceptive. To the extent Jacobsen responds at all to Toro's allegations with respect to this claim, it appears to rely on a defense of truth.

Toro claims that Jacobsen's false and deceptive claims have misled distributors, dealers, and consumers into purchasing Jacobsen snow throwers rather than Toro's competing product and that Toro has been damaged through loss of both profits and good will. Jacobsen's response focuses primarily on the absence of any evidence that any of the challenged claims have caused anyone to purchase a Jacobsen rather than a Toro or, indeed, have misled anyone.

### B. *Analysis.*

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),[19] prohibits false and deceptive comparative advertising of the kind in which Jacobsen has allegedly engaged.[20] *See, e. g., American Home Products Corp. v. Johnson and Johnson,* 436 F.Supp. 785 (S.D. N.Y.1977), *aff'd.* 577 F.2d 160 (2d Cir. 1978); *American Brands, Inc. v. R. J. Reynolds Tobacco Co.,* 413 F.Supp. 1352 (S.D.N.Y. 1976); *Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equipment Corp., Inc.,* 397 F.Supp. 1063 (W.D.Pa.1975), *vacated and remanded on other grounds,* 546 F.2d 530 (3rd Cir. 1976), *cert. denied* 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977); *Skil Corp. v. Rockwell International Corp.,* 375 F.Supp. 777 (N.D. Ill.1974).

To prevail on a claim of unfair advertising under Section 43(a), a plaintiff must first prove by a preponderance of the evidence that the claims it challenges are false or deceptive. *American Home Products Corp. v. Johnson and Johnson, supra,* 436 F.Supp. at 797. Where the plaintiff concedes that the challenged claims are literally true but maintains that they are nevertheless actionable because deceptive, he must persuade the court that the persons "to whom the advertisement is addressed" would find that the message received left a false impression about the product. *American Brands, Inc. v. R. J. Reynolds Tobacco Co., supra,* 413 F.Supp. at 1357. It must further be shown that the false or deceptive statement is "material, in that it is likely to influence the purchasing decision." *Skil Corporation v. Rockwell International Corp.,* 375 F.Supp. 777 (N.D.Ill.1974). Finally, in order to obtain damages the plaintiff must show that the falsification actually deceived the buying public. *Parkway Baking Co. v. Freihofer Baking Co.,* 255 F.2d 641, 648 (3d Cir. 1958). To obtain injunctive relief, however, there is "no requirement that purchasers actually be deceived, but only that the false advertisements have a tendency to deceive." *Id.* at 649. With these principles in mind, I turn to an analysis of the seven challenged claims.

1. RESERVE POWER. On the basis of the testimony of Toro's senior test engineer, Gary Polk, I conclude that Jacobsen's claim that the power burst feature helps prevent stalling in drifts is false. Polk stated with-

---

**19.** Section 43(a) provides, in part, as follows:
Any person who shall . . . use in connection with any goods or services . . . any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such . . . description or representation cause or procure the same to be transported or used in commerce . . . shall be liable to a civil action . . . by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

**20.** Section 43(a) does not prohibit a defendant's disparagement of a plaintiff's product. *E. g., Bernard Food Industries v. Dietene Co.,* 415 F.2d 1279 (7th Cir. 1969), *cert. denied,* 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92 (1970). While the amended complaint in the instant case contains a disparagement count, Toro has identified no instance in which Jacobsen's advertising has included false or deceptive representations concerning Toro's snow thrower.

out contradiction in the record that "it is maximum available torque at the impeller of the machine at lower speeds approaching stall which must be increased by an engine feature if the engine is to prevent stalling of the machine in heavy drifts." (DX 142, p. 4). Polk tested the Sno–Burst in power burst and non–power burst modes at a low engine speed and found that "the torque available in both modes as the impeller slows and approaches the stall condition is identical." (*Id.*) Accordingly, he concluded, "the Power Burst feature does not help prevent stalling in heavy drifts." (*Id.*) The fact that Polk also testified that the Sno–Burst can be operated "in a drift in a manner in which the power burst would give you more power than the non–Power Burst mode" (DX 303, p. 172) is beside the point. Given Jacobsen's advertising claim, the relevant question is whether the power burst feature will "help prevent stalling in heavy drifts."

2. ENGINE SIZE. The evidence adduced by Toro and Jacobsen relevant to the engine size claims consists primarily of results of engine power tests conducted under different conditions and producing widely varying outcomes. (Cf. PX 46, 142; DX 176). At least one test, conducted by a third party, indicated that the Jacobsen engine may, under certain conditions, produce better than three horsepower. (DX 176). Suffice it to say, I am unpersuaded that the engine used by Jacobsen on its snow thrower is incapable of generating three horsepower. Accordingly, I do not find that its description of the engine size of its engine as "3 HP" is literally false. Moreover, there is nothing in this record from which I might conclude that a substantial portion of the target group for this advertising would understand this description of engine size as a representation that the engine would produce three horsepower when in use on a Sno–Burst snow thrower.[21] Finally, while I am convinced that the target group would read the challenged advertising as representing that the Jacobsen engine is bigger

and more powerful than the Toro engine to a significant degree, I am not persuaded that this is an erroneous impression. Nelson Muffler, for example, gave the engine of each company its standard tests and came up with about 2.5 horsepower for the Jacobsen and 1.88 horsepower for the Toro at the same speed. (DX 314, 42, 49).

3. PRIME TO START? Jacobsen's claims that no priming is necessary to start its engine and that its engine is easier to start because of this feature are both false. Jacobsen recommends the following procedure to start the engine on its Sno–Burst snow thrower:

(1) turn the ignition switch to 'RUN';

(2) pull the choke lever to full choke;

(3) *pull the starter cord slowly a few times to 'help initiate fuel flow in the pumper section of the carburetor'*;

(4) pull the starter cord rapidly to start the engine; and

(5) push the choke button in after the engine was started.

(PX 145, 6 (emphasis added)).[22] Jacobsen argues that pulling the starter cord slowly a few times does not constitute priming because the action initiates flow or fuel into the pumper section of the carburetor rather than pumping fuel into the engine itself. This is a distinction without a difference. While it is seldom advisable to dissect an advertisement "with dictionary in hand" to determine whether it is deceptive, 1 R. Callmann, *Unfair Competition, Trademarks and Monopolies* (3d Ed. 1967 and 1979 Supp.), § 19.2(b)(1), reference to the dictionary in this case demonstrates that Jacobsen's "no priming necessary" claim is literally false. Webster's Third New International Dictionary Unabridged defines "prime" as "to put into working order by filling or charging with something: as b) to pour gasoline into the carburetor of (an engine)".

Moreover, I think it apparent that Jacobsen's arrangement for accomplishing the

---

**21.** One can interpret the evidence as suggesting that technical people in the field do not expect an engine to generate its rated horsepower on a regular basis off the test stand.

**22.** The Jacobsen Sno–Burst Operator's Manual and Parts List (PX 508) states at page 6:
Easier starting is accomplished by pulling the starter cord slowly, two or three times, to its full length. This will help initiate fuel flow in the pumper section of the carburetor.

priming function does not result in any greater ease of starting than a snow thrower with a button primer like Toro's snow thrower.

4. GAS/OIL RATIO. Toro has adduced evidence (DX 304, pp. 32–33), uncontradicted by Jacobsen, that simply because one engine uses a higher gas–to–oil ratio than another, different engine, the former need not run smoother or smoke less than the latter. Nonetheless, Toro has not carried its burden because it has failed to introduce any evidence to support the proposition that Jacobsen's engine does not, in fact, run smoother with less smoking than the Toro and this is the only material aspect of Jacobsen's claim.

I cannot accept Toro's argument that it is entitled to prevail on a claim under Section 43(a) simply by showing that a defendant's advertising claim is unsubstantiated. The plain language of Section 43(a), which prohibits false rather than unsubstantiated representations, requires that a plaintiff establish not merely that the defendant's claim lacks substantiation but also that it is false or deceptive.

5. WHEEL SIZE. Jacobsen's claim that its Sno–Burst snow thrower is "easier to push, simpler to maneuver" is false. Both the consumer tests conducted by Toro (PX 48) and the test run by John Deere Company (PX 144), the validity of which Jacobsen does not challenge, satisfy Toro's burden of showing by a preponderance of the evidence that the Toro machine is, at worst, no harder to push or less maneuverable than the Jacobsen. The testimony cited by Jacobsen does not support its contention that any employee of Toro–or anyone else for that matter–regarded Jacobsen's snow thrower as easier to push or more maneuverable than Toro's.

6. AUGER HOUSING. Toro has failed to prove that Jacobsen's claim that "[a]lu-minum's more rugged, more durable" is false or deceptive. The only evidence from which one might draw an inference on this question is the comparative impact testing conducted by Toro. (PX 58). I decline to do so. Toro correctly notes that both the Toro and Jacobsen machines tested performed satisfactorily, but the test did not disclose whether Jacobsen's aluminum or Toro's plastic is the more rugged and durable material.

7. HANDLE. Jacobsen's claim that its handle can be adjusted by different operators is not literally false and, while a record might be built to support the proposition that the target group would receive a false impression from Jacobsen's handle claim, I cannot find on this record that it is deceptive. There is no direct evidence of its impact on any portion of the target group and it is not a situation where the claim itself might provide a basis for an inference regarding its impact.

■ In summary, while Toro has not carried its burden of persuasion on a number of its allegations, I do conclude that Jacobsen's claim that its power burst feature helps prevent stalling in drifts, its claim that no priming is required to start its engine, and its claim that its snow thrower is more maneuverable than that of Toro are false. I further conclude that these are claims about features of sufficient substance that they would have a significant propensity to effect a consumer's purchase decision.[23] This conclusion regarding the tendency of the false claim to mislead is supported by the testimony of Toro's marketing expert (Tr. p. 334) as well as by common sense.

### III. DAMAGES.

When one examines the record in this case to determine whether the plaintiff has

---

**23.** The claims I have found to be false do not fall beyond the scope of Section 43(a), as Jacobsen urges, as examples of mere "puffing". "An advertisement characterized as puffing is one that is not deceptive for no one would rely on its exaggerated claims." *Callman, supra*, § 19.2(b)(2). Jacobsen is, of course, correct in arguing that claims constituting no more than puffing are not actionable under Section 43(a).

None of Jacobsen's claims which I have found to be false can be characterized as puffs, however. Those claims are not the kind of hyperbolic statements one would take or be intended to take literally. On the contrary, they are manifestly meant to be believed and relied upon, and I cannot say that a reasonable prospective purchaser would fail to take them seriously.

carried its burden of showing "actual consumer reliance"[24] one is struck by one thing. There is no evidence that any consumer, dealer or distributor relied on the Jacobsen advertisement, much less upon the particular claims I have found to be false, to Toro's detriment.[25] This deficiency is fatal to Toro's damage claim. While it did not have the "burden of proving detailed individualization of loss of sales" at the trial, it did have the burden to show "some customer reliance on the false advertisement." *Ibid.*

Most of the evidence relied upon by Toro to show actual reliance consisted of testimony tending to show that Jacobsen competed with Toro in 1978 and 1979 with some degree of success.[26] In the damage context, this evidence must be viewed in light of the fact that Toro sold all the snow throwers it could make in 1978 and 1979. But beyond that fact, Section 43(a) prohibits unfair competition rather than competition itself and Toro has failed to show that the experience of these parties in the marketplace was a product of the former rather than the latter.

■ The remaining evidence relied upon by Toro consists primarily of a letter from Jacobsen's Advertising Manager touting the excellence of its advertising campaign and affidavits of two distributors reflecting their opinions, based on comments of "various (unidentified) dealers" that "Toro retail sales were preempted by Jacobsen as a result of consumer reliance upon the representations made by Jacobsen." (E. g. DX 171, p. 2). These provide an inadequate

basis for a finding of actual reliance. In the absence of any evidence that any particular distributor, dealer, or consumer has personally been misled, I conclude that Toro's damage claim must be denied.

## IV. INJUNCTIVE RELIEF.

This is not to say that Toro should be denied relief. As earlier noted, to obtain an injunction under Section 43(a), a plaintiff need only show that the misrepresentations of which it complains "have a tendency to deceive." *Parkway Baking Co. v. Freihofer Baking Co., supra,* 255 F.2d at 649. I have previously concluded that the three claims found to be false do have a tendency to mislead consumers into purchasing a Jacobsen rather than a Toro, and injunctive relief is, therefore, appropriate. Jacobsen will be permanently enjoined from making or causing to be made the claims that the power burst feature of the Sno–Burst helps prevent stalling in drifts; that the Sno–Burst does not require priming, and that the Sno–Burst is easier to push or more maneuverable than the Snow Master.[27] Jacobsen will also be ordered to make reasonable efforts to retrieve any cassettes or other materials still in the marketplace.

■ Toro is not entitled to a mandatory injunction requiring Jacobsen to correct its past misrepresentations in future advertising. As Toro recognizes, the purpose of such relief would be to minimize the damage to it resulting from Jacobsen's false claims. In light of Toro's inability to show that it has actually been injured by those claims, mandatory injunctive relief of the kind sought is as inappropriate as an award of monetary damages.

24. *Parkway Baking Co. v. Freihofer Baking Co., supra,* 255 F.2d at 648.

25. No distributor, dealer or customer testified about his own false impression and there were no relevant survey studies. While several market research and consumer perception studies were introduced into evidence, none dealt with the impact of the challenged claims on the target group.

26. *E. g.,* evidence that Jacobsen sold more snow throwers than it originally forecasted, that Jacobsen "outsold" Toro in some instances where they were marketed on the same floor,

that one distributor attempted to cancel orders for Toro snow throwers because of Jacobsen's presence in the marketplace.

27. The doctrine of unclean hands does not bar injunctive relief in this case. The doctrine is clearly applicable in injunction actions under Section 43(a). *Ames Publishing Co. v. Walker–Davis Publications, Inc.,* 372 F.Supp. 1, at 13–15. However, Jacobsen has failed to demonstrate that Toro has engaged in any misconduct which would render the issuance of an injunction inequitable.

Finally, Toro's prayers for attorneys' fees and treble and punitive damages will also be denied. Section 35 of the Lanham Act, 15 U.S.C. § 1117, authorizes the award of attorneys' fees in "exceptional cases." [28] The evidence adduced by Toro does not convince me that this case is so "exceptional" as to justify an award of attorneys' fees. The availability of treble and punitive damages is also governed by Section 35.[29] As the Third Circuit Court of Appeals has stated in construing that section, "If the record in the district court contains no evidence of actual damage . . . no monetary award may be made under § 35 of the Lanham Act and the trademark owner must be content with injunctive relief." *Caesars World, Inc. v. Venus Lounge, Inc.*, 520 F.2d 269, 274 (3d Cir. 1975). For the reasons given above, this rule is applicable to the facts of this case.

---

**28.** The last sentence of Section 35, added in 1975 to overrule *Fleishmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967), in which the Supreme Court had held that attorneys' fees may not be recovered under the Lanham Act, states, "The court in exceptional cases may award reasonable attorney fees to the prevailing party."

**29.** The portion of Section 35 which deals with monetary awards in excess of actual damages provides as follows:

In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.