**ENERGY FOUR, INC., Plaintiff,**

v.

**DORNIER MEDICAL SYSTEMS, INC., Defendant.**

**Civ. A. No. 1:90–CV–1287–JOF.**

United States District Court, N.D. Georgia, Atlanta Division.

Feb. 27, 1991.

Lowell Steven Fine, Jane Fugate Thorpe, Lawrence Brannen Domenico, Alembik, Fine & Callner, William E. Sumner, Sumner & Hewes, John Allen Howard, David Kiser Whatley, Williston Carpenter White Fortson & White, Atlanta, Ga., for plaintiffs.

Richard C. Mitchell, William M. Ragland, Jr., Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., George R. Kucik, John M. Packman, Randall J. Boe, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., for defendants.

## ORDER

FORRESTER, District Judge.

This matter is before the court after a consolidated hearing on both parties' motions for preliminary injunction. Plaintiff/counterclaim defendant Energy Four, Inc. and defendant/counterclaim plaintiff Dornier Medical Systems, Inc., each ask the court to enjoin the other from making false and misleading statements that allegedly violate the Lanham Act, 15 U.S.C. § 1116(a), and the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10–1–373(a). Plaintiff's motion for sanctions is also before the court.

## I. FINDINGS OF FACT

Plaintiff Energy Four, Inc. (Energy Four) and Dornier Medical Systems, Inc. (Dornier) are both Georgia corporations. Dornier's parent company, Dornier Medizintechnnik GmbH, manufactures lithotripsy machines which are medical devices that use shock waves to fragment kidney stones. The shock waves are produced by electrodes which must be replaced after a certain number of shocks, generally after each patient treatment. Dornier's parent company also manufactures replacement electrodes for its lithotripsy machines. Dornier distributes machines and replacement electrodes manufactured by its parent. Energy Four competes with Dornier by refurbishing used electrodes at a cost less than the price of new replacement electrodes. Energy Four is the nation's largest supplier of electrode refurbishment services. There are approximately 250 lithotripsy machines currently being used in the United States. All Dornier lithotripsy machine users are potential customers of Energy Four.

The Food and Drug Administration regulates the sale of lithotripsy machines and electrodes in the United States by requiring vendors to submit a Pre–Market Approval Application (PMA). The first electrodes sold by Dornier in the United States were approved for marketing with a 700–shock life rating at a setting of 18 kilovolts of electricity. Later versions of the Dornier electrode were approved for marketing in the United States with rated shock lives of 1100, 1500, and 2,000 shocks. The FDA approved a PMA Supplement allowing Dornier to market its electrodes for 1500 shocks when used in the range of 14 to 20 kilovolts in 1987.

The electrode approved for sale in the United States by Dornier as a 1500 shock electrode was, at least for some period, simultaneously marketed as a 2,000 shock electrode outside of the United States. In March of 1989 Dornier changed the tolerance range for the hardness coefficient of the electrode tips. Coefficients equal to or greater than 680 kilopons per square millimeter were previously acceptable. The new electrodes were manufactured with a tolerance range of 680 to 790 kilopons per square millimeter. The court was unable to determine, on the basis of evidence produced at the hearing, whether the tips of any old 1500 shock electrodes exceeded the new upper limit. Apparently, the other electrode specifications were unchanged.

There was conflicting evidence as to when Dornier began marketing 1500 shock electrodes that were produced under the new tolerance range. Defendant's own witnesses gave contradictory testimony concerning the length of time involved. It is undisputed that the only change made in the then rated 1500 shock electrode, when Dornier began marketing it for a 2,000 shock life in February of 1990, was the color of the plastic locking ring. All electrodes marketed for 2,000 shocks in the United States were manufactured with a blue plastic locking ring.

Both the old 1500 shock electrodes and the new 1500 shock electrodes produced under the stricter hardness coefficient controls were manufactured with a white plastic locking ring. Consequently, it may be impossible to distinguish between the old and new 1500 shock electrodes by visual inspection. Because Energy Four destroys the Dornier label during the refurbishing process, it is difficult for the end user to determine when the refurbished electrode was originally manufactured.

Dornier requested approval for the increased number of shocks per service life by submitting Supplement No. 22 to Pre–Market Application Number P840008, dated May 3, 1989. The supplement identifies "improved steel production techniques which allow better control of the hardness coefficients" of the electrode tips as a modification in the electrode producing a higher number of shocks per service life. No other modifications in the electrode itself are identified.

The PMA does not identify the tolerance range for the hardness coefficient. The specification sheets produced by Dornier for the 2,000 shock electrode (S2000/18) and the 1500 shock electrode (S1500/18) are identical. Neither specifies the hardness coefficient range. However, the FDA approval for marketing at 2,000 shocks was based on demonstrations of extended shock life produced by electrodes manufactured under the new tolerance ranges.

On August 26, 1987 Jeffrey S. Mesquita, now president of Energy Four, wrote the FDA regarding the development of a process to refurbish Dornier electrodes. The FDA informed Mesquita that,

As long as your refurbishing operation brings the electrodes back to the original specifications that were approved in the Pre–Market Approval Application and you do not take actual title to them, we would not require the registration of your refurbishing operation nor would we require your firm to submit a pre-market notification or seek pre-market approval for its operation. If, however, your firm changes the specifications of the electrodes either on its own behalf or upon the request of the owner of the electrode then the above decision would have to be reconsidered.

In a letter dated August 21, 1990, the FDA stated,

> From what we have been able to determine at this time, Energy Four does not acquire ownership of the lithotripter electrodes they refurbish, and therefore is exempt from our current policy.

The FDA conducted an on-site inspection of Energy Four's facilities sometime in the spring of 1990. As of yet, the FDA has not issued any inspection report, notice of deficiency, or any finding that Energy Four was in compliance with the Food, Drug and Cosmetic Act.

As competition between Dornier and electrode refurbishers intensified during 1989 and early 1990, Dornier began an intensive campaign to discourage its customers from using the refurbished electrodes. These efforts were aggressively countered by Energy Four. Users of Dornier lithotripter machines were bombarded by information from both parties containing conflicting information regarding both new Dornier electrodes and Dornier electrodes refurbished by Energy Four. Dornier questioned the safety and reliability of refurbished electrodes, emphasizing that refurbished electrodes had not been tested or "approved" by the FDA. Energy Four told customers that Dornier had misled them about differences between the S1500/18 and the S2000/18 electrodes and promised that it could refurbish S1500/18 electrodes for a 2,000 shock life. Energy Four consistently represented that it refurbished electrodes to the exact specifications used by Dornier and approved by the FDA.

The parties presented conflicting evidence regarding the character of Energy Four's claims of FDA approval. Plaintiff presented evidence that most if not all of the letters sent to potential customers regarding FDA approval included a copy of the FDA letters stating that Energy Four was exempt from FDA registration and PMA requirements. Defendant produced evidence that Energy Four represented that the FDA had found it to be in full and complete compliance with the Food, Drug and Cosmetic Act.

In early 1990 Dornier distributed a brochure entitled "Customer Report: Refurbished Electrodes" that, *inter alia,* made reference to a "catastrophic failure" of a refurbished electrode. The distribution of this brochure to all of Dornier's customers provided the impetus for this lawsuit. Additionally, in a February 12, 1990 letter to the Hospital Corporation of America, Dornier's national accounts sales manager stated that the catastrophic failure had occurred in Texas, and had resulted in an "implosion and significant equipment damage." Defendant has admitted the falsity of this statement.

Defendant did present evidence that a problem occurred while an Energy Four refurbished electrode was being used at a lithotripsy site in Texas. No patient injury or equipment damage resulted from that incident. Defendant's own witnesses gave conflicting testimony as to whether the electrode actually "came apart" and whether the positioning ring came off during use or after the electrode was removed from a lithotripsy machine.

The Dornier brochure linked the alleged catastrophic failure to the use of glue to bond the position ring of the electrode in the refurbishing process. The brochure stated,

> Almost all electrode refurbishers break off the electrode's plastic positioning ring in order to machine the electrode's inner and outer conductor tips. When the plastic positioning ring is removed, a positive mechanical lock is destroyed. The plastic positioning ring can no longer be mechanically locked into place, but must then be *glued* back into place. This modification to Dornier's electrode design is a serious safety and performance concern, since the glue bonding process can permit ring slippage and corresponding uncontrolled movement of F1 and F2. Recently, one mobile lithotripsy service reported the catastrophic failure of a refurbished electrode—where the ring slipped completely off the electrode during use.
> Until 1987, the positioning rings of all Dornier electrodes were similarly glue

bonded to the electrode. At that time, Dornier learned of some cases of ring slippage and movement of F2. Dornier then voluntarily recalled its electrodes and developed the current design which uses the *positive mechanical lock* [emphasis in original].

It is true that Dornier initiated an exchange program after receiving reports of ring slippage on smooth-bodied electrodes. It is also true that the FDA subsequently *ordered* a recall of all Dornier electrodes in 1987.

The electrodes currently produced by Dornier's parent and distributed by Dornier are manufactured with three mechanical locks which are designed to prevent ring slippage. Two of these locks prevent the ring from slipping backwards toward the generator of the lithotripsy machine. The brochure refers to the locking mechanism designed to prevent the ring from slipping forward on the electrode. The rear slippage locks are not affected by the refurbishing process. Energy Four does break the mechanical forward slippage lock to remove the positioning ring for the refurbishing process. After refurbishing, Energy Four uses a tap to cut grooves five-thousandths of an inch deep in the body of the electrode. Energy Four then cuts grooves in the interior of the positioning ring designed to interlock with the grooves in the body of the electrode. The gaps between the interlocking grooves are filled with a cyano acrylate glue. Thus, the refurbished electrode is not completely "similar" to the electrode subject to the FDA recall. Those electrodes had a smooth-bodied design. None of the three locking mechanisms currently used by Dornier were incorporated in their design. As noted above, two of these mechanisms are unaffected by the refurbishing process.

The parties' respective expert witnesses gave conflicting testimony as to the relative effectiveness of Energy Four's modifications to prevent ring slippage after refurbishing. The court found that the opinions given by the experts were not based on scientifically reliable studies. Because of the court's severe misgivings about the size and integrity of the samples of elec-trodes tested by the experts, the court was unable to draw factual conclusions from their reports and testimony.

There was absolutely no evidence produced at the hearing by Dornier Medical Systems, Inc. that there has ever been a catastrophic failure of an Energy Four refurbished electrode, as that term is ordinarily understood, contrary to assertions made by Dornier in the brochure and in communications with its customers. The evidence showed only two or three instances of a failure of the glue bond on Energy Four refurbished electrodes. There was no evidence adduced at the hearing that any patient has been harmed on account of having been treated with an Energy Four refurbished electrode, nor was there any evidence adduced that any generator or other part of a lithotripsy machine has been damaged seriously on account of the use of Energy Four refurbished electrodes.

At the hearing, Dornier argued that the court should take judicial notice of the definition of "catastrophic failure" in the MCGRAW–HILL DICTIONARY OF ENGINEERING (1984), the MCGRAW–HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS (4th Edition 1989), and the MODERN DICTIONARY OF ELECTRONICS (6th Edition, 1989). These dictionaries define catastrophic failure as "a sudden failure without warning, as opposed to degradation failure" and as "failure whose occurrence can prevent the satisfactory performance of an entire assembly or system." Dornier has cited a number of cases where the courts have taken notice of these definitions.

Energy Four produced evidence in the form of testimony by William J. Casarella, an Energy Four stockholder, and Patrick T. Hunter, II, a consultant retained by Energy Four, that catastrophic failure was generally understood in the relevant medical community to mean a failure resulting in serious equipment damage or patient injury. Three other witnesses not associated with Energy Four corroborated Casarella and Hunter's testimony. Dornier presented no evidence that the dictionary defini-

tions reflected a common understanding among targeted consumers.

The court took judicial notice only of the fact that the dictionaries offered contained the definitions urged by Dornier. The court declined to adopt them as controlling. The court is of the opinion that Dornier's representations are actionable falsehoods even under the proffered definition. The alleged incidents of refurbished electrode failure did not involve sudden or systemic failure.

A number of consumers of electrodes for lithotripsy machines have never used Energy Four refurbished electrodes, or electrodes refurbished by any other company, either out of natural caution or on account of limited and unsophisticated on-premises tests, or on account of perceived technical difficulties in actual operation. The court notes, however, that since beginning operations, Energy Four, Inc. has refurbished between 15,000 and 20,000 electrodes, the vast majority of which seemed to have been used by consumers without even anecdotal evidence of clinical catastrophic failure.

## II. APPLICABLE LAW

### A. *Lanham Act*

■ Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988), provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

1) is likely to cause confusion, or to cause mistake, or to deceive as to the ... sponsorship, or approval of his or her goods, services, ... or

2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, ... of his or her or another person's goods ... shall be

liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

To prevail on a Lanham Act claim that a defendant has made false or misleading representations in commercial advertising or promotion, a plaintiff must show that the representations were false, or misleading and actually or likely deceptive; that they were material in effect on buying decisions; that they were made in connection with interstate commerce;[1] and that they were actually or likely injurious to plaintiffs. *Alpo Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 964 (D.C.Cir. 1990); *United States Healthcare v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 923–24 (3rd Cir.1990); *American Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160, 165–66 (2nd Cir.1978). As amended, the Act provides a cause of action for false or misleading descriptions and representations by a defendant concerning either plaintiff's or defendant's products.

### B. *Georgia Uniform Deceptive Trade Practices Act*

■ A person engages in a deceptive trade practice within the meaning of the Georgia Uniform Deceptive Trade Practices Act when he "causes likelihood of confusion or of misunderstanding" or makes misrepresentations concerning approval or certification of a product, misrepresents the standard, quality or grade of a product, disparages the goods of another by false or misleading representations of fact, or engages in other conduct similarly creating a likelihood of confusion or misunderstanding. O.C.G.A. § 10–1–372(a)(2, 5, 7, 8, 12). A party need not demonstrate actual confusion or misunderstanding to prevail under the Act. O.C.G.A. § 10–1–373(b). The Act authorizes injunctive relief for a person likely to be damaged by a deceptive trade practice "under the principles of equity and on terms the court considers reasonable." O.C.G.A. § 10–1–373(a). No proof of monetary damages, lost profits, or intent to de-

---

**1.** Neither party disputes that the allegedly false and misleading representations were made in the realm of interstate commerce.

ceive is required. *Id.* The remedy provided by the Act is limited to injunctive relief but is cumulative with other statutory and common law remedies. O.C.G.A. § 10–1–373(c); *Lauria v. Ford Motor Co.,* 169 Ga.App. 203, 206–207, 312 S.E.2d 190 (1983); *Diedrich v. Miller & Meier & Assocs.,* 254 Ga. 734, 736, 334 S.E.2d 308 (1985).

■ The Uniform Deceptive Trade Practices Act involves the same dispositive questions as the Federal Lanham Act. *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.,* 716 F.2d 833, 839 (11th Cir.1983), quoted in *Original Appalachian Artworks, Inc. v. Schlaifer Nance & Co., Inc.,* 679 F.Supp. 1564, 1578 (N.D.Ga.1987) (holding that a failure to establish the predicate falsity under the Lanham Act forecloses claims for violation of the Uniform Deceptive Trade Practices Act). Plaintiffs asserting state law claims under versions of the Uniform Trade Deceptive Practices Act must still establish the prerequisites for a preliminary injunction. *Original Appalachian Artworks, Inc. v. Topps Chewing Gum, Inc.,* 642 F.Supp. 1031, 1033 (N.D. Ga.1986), citing *Dallas Cowboy Cheerleaders v. Scorecard Posters, Inc.,* 600 F.2d 1184, 1187 (5th Cir.1979) and *Scientific Applications, Inc. v. Energy Conservation Corp. of America,* 436 F.Supp. 354, 357 (N.D.Ga.1977). Thus, the court's analysis under the Lanham Act will dispose of the state law issues.

## C. *Analysis of a Lanham Act Claim*

A court must first determine whether a representation is either false or misleading. *United States Healthcare,* 898 F.2d at 922; *Stiffel Co. v. Westwood Lighting Group,* 658 F.Supp. 1103, 1110 (D.N.J.1987). The court begins by examining the message defendant's representations convey. *United States Healthcare,* 898 F.2d at 922 (citing *Plough, Inc. v. Johnson & Johnson Baby Prods. Co.,* 532 F.Supp. 714, 717 (D.Del.1982). A court must initially consider a statement's literal meaning and then determine whether it conveys to the target audience any implied message beyond that meaning. *Avis Rent A Car System v. Hertz Corp.,* 782 F.2d 381, 385–86 (2nd Cir.1986); *American Home Products v. Johnson & Johnson,* 577 F.2d at 165. The message may be clear on its face, but context is usually important. *United States Healthcare,* 898 F.2d at 922.[2]

■ A mere failure to disclose is not actionable under the Lanham Act unless representations made are "affirmatively misleading, partially incorrect, or untrue as a result of [a] failure to disclose a material fact." *United States Healthcare,* 898 F.2d at 921 (quoting 2 J. McCarthy, *Trademarks and Unfair Competition* § 27:7(B) (2nd Ed.1989)). A plaintiff need not establish an intent to deceive. *United States Healthcare,* 898 F.2d at 922; *Parkway Baking Co. v. Freihofer Baking Co.,* 255 F.2d 641, 648 (3rd Cir.1958).

### 1. Actually False Claims

■ When representations are actually false, a court does not have to determine whether the representations are likely to create confusion. *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.,* 902 F.2d 222 (3rd Cir.1990). Furthermore, actually false claims are presumed material. *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.,* 818 F.2d 266, 272 (2nd Cir.1987). Relief can be granted without reference to the reaction of consumers. *Id.* (citing *American Brands, Inc. v. R. J. Reynolds Tobacco Co.,* 413 F.Supp. 1352, 1356 (S.D.N.Y.1976)). *See also Camel Hair & Cashmere Inst. v. Associated Dry Goods Corp.,* 799 F.2d 6, 15 (1st Cir.1986); *Johnson & Johnson v. GAC Int'l, Inc.,* 862 F.2d 975, 977 (2nd Cir.1988).

### 2. Misleading Claims

■ The statute embraces false impressions, innuendo, and ambiguous suggestions. *Johnson & Johnson v. GAC*

---

**2.** Context is particularly important where the targeted consumers are a well-informed and sophisticated audience because such an audience is less likely to be misled. *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.,* 902 F.2d 222, 229 (3rd Cir.1990) (citing *Plough, Inc. v. Johnson & Johnson Baby Prods. Co.,* 532 F.Supp. at 717.

*Int'l, Inc.*, 862 F.2d at 975; *Vidal Sassoon, Inc. v. Bristol–Myers Co.*, 661 F.2d 272 (2nd Cir.1981). When such a representation is literally true, a plaintiff has the burden of persuading the court that the persons to whom the advertising or promotion is addressed would receive a false impression about a product. *United States Healthcare*, 898 F.2d at 922; *Toro Co. v. Textron, Inc.*, 499 F.Supp. 241, 253 n. 23 (D.Del.1980) (quoting 1 R. Callman, *Unfair Competition, Trademarks and Monopolies*, § 19.2(b)(2) 3rd Ed. (1979 Suppl.). He must do more than show that the defendant has failed to offer persuasive evidence in support of the truth of defendant's representations. *Procter & Gamble Co. v. Chesebrough–Pond's, Inc.*, 747 F.2d 114, 119 (7th Cir.1984). A plaintiff is relieved of the burden of producing evidence of a tendency to mislead only when plaintiff can prove the challenged statements are actually false. *Id.*[3]

## III. PRELIMINARY INJUNCTION STANDARD

■ Under the Lanham Act, the district courts have jurisdiction to enter a preliminary injunction. *U–Haul Int'l, Inc. v. Jar-*

*tran, Inc.*, 681 F.2d 1159, 1162 (9th Cir. 1982); *Vidal Sassoon v. Bristol–Myers Co.*, 661 F.2d 272 (2nd Cir.1981). A movant is entitled to a preliminary injunction only when that party clearly shows,

> 1) A substantial likelihood that it will succeed on the merits;
>
> 2) That it will suffer irreparable harm unless the injunction issues;
>
> 3) That the potential injury outweighs possible harm to the opposing party; and
>
> 4) That the injunction would not be adverse to the public interest.

*Frio Ice, S.A. v. Sunfruit, Inc.*, 918 F.2d 154, 159 (11th Cir.1990); *Cunningham v. Adams*, 808 F.2d 815, 819 (11th Cir.1987). *See also Second Earth Enterprises, Inc. v. Allstar Product Marketing Co.*, 717 F.Supp. 302 (E.D.Pa.1989) (trade dress case under Lanham Act).

### A. *The Merits*

■ To succeed on the merits it is not enough to show that the representation is facially ambiguous or unsubstantiated—a plaintiff must show that the representations are (1) false or (2) mislead by tending to create confusion. *Sandoz Pharmaceuticals Corp.*, 902 F.2d at 229; *PPX Enter-*

---

3. When a statement is literally true but allegedly misleading, to recover money damages, plaintiff must *prove* actual deception by a preponderance of the evidence, showing how consumers actually do react, not merely how they might react. *Sandoz Pharmaceuticals*, 902 F.2d at 228–229. Public reaction is the starting point of inquiry— the court's own reaction "is at best not determinative and at worst irrelevant." *American Home Prods. Corp. v. Johnson & Johnson*, 577 F.2d at 165.

When representations are not literally false, the requisite causation and likelihood of injury generally are not presumed but must be demonstrated. *Coca-Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 316 (2d Cir.1982); *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 189–90 (2d Cir.1980). Materiality or causation is established by showing that the allegedly false or misleading representation is likely to influence purchasing decisions. *Toro Co.*, 499 F.Supp. at 251, *United States Healthcare*, 898 F.2d at 922. This does not mean that a plaintiff's "mere subjective belief that he is likely to be injured" will support a Lanham Act cause of action. *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d at 190. A plaintiff must present evidence to provide a reasonable basis for be-

lieving that injury is likely. *Id.; Vidal Sassoon, Inc. v. Bristol-Meyers Co.*, 661 F.2d at 278. Market studies showing that a defendant's representations do in fact mislead targeted consumers can also supply a causative link to a plaintiff's potential lost sales. *Coca-Cola Co.*, 690 F.2d at 316–17. If the parties are competitors, once a plaintiff has shown that a representation is false or has a tendency to mislead, the likelihood of irreparable injury can be presumed. *McNeilab, Inc. v. American Home Products, Inc.*, 848 F.2d 34, 38 (2nd Cir.1988).

Survey research is not required, as a matter of law, to support a state or federal agency's finding that an advertisement is misleading. *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 40 (D.C.Cir.1985). When the possibility of consumer deception is self-evident, the state need not produce consumer surveys to establish a tendency to mislead. *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 652, 105 S.Ct. 2265, 2282, 85 L.Ed.2d 652 (1985) (citing *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 391–92, 85 S.Ct. 1035, 1046–47, 13 L.Ed.2d 904 (1964). However, a private plaintiff under the Lanham Act is not entitled to the deference given a determination by the state or the FTC as an administrative agency. *Sandoz Pharmaceuticals*, 902 F.2d at 228.

prises, Inc. v. Audiofidelity Enterprises, Inc., 818 F.2d at 271–72; Procter & Gamble Co. v. Chesebrough–Pond's, Inc., 747 F.2d at 119; Toro Co. v. Textron, Inc., 499 F.Supp. at 251.

### 1. Statements Allegedly False

 Energy Four is likely to prevail on its claim that Dornier's statements concerning a "catastrophic failure" of an Energy Four refurbished electrode were false representations constituting a violation of the Lanham Act. These representations were made in several contexts, including a letter from Michael Whittenberg to Ben Cheney at Hospital Corporation of America, dated February 12, 1990, stating that a catastrophic failure of a refurbished electrode occurred in Texas and resulted in an implosion and significant equipment damage. They also include statements in Dornier's "Customer Report" brochure concerning a report of a catastrophic failure of a refurbished electrode.

The court finds that Dornier is substantially likely to prevail on its claim that Energy Four's representations concerning FDA approval of refurbished electrodes constituted a violation of the Lanham Act. The following specific representations are substantially likely to be proven false:

1) That Energy Four refurbishes used Dornier electrodes according to the requirements of the Food and Drug Administration.

2) That Energy Four underwent an FDA inspection and was found to be fully in compliance with the Food, Drug and Cosmetic Act.

3) That Energy Four's refurbished electrodes have FDA approval.

4) That with 100% surety, the Dornier 1500 and 2,000 electrodes are the same except for labeling, packaging and the color of the positioning ring.

5) That Dornier has supplied Energy Four with Dornier's ever-changing working specifications.

5) That Energy Four possesses written verification that the Dornier 1500 and 2,000 electrodes are identical and that a Dornier service executive and senior marketing executive have confirmed to Energy Four and some current customers that these electrodes are the same.

6) That it is prudent for lithotripter operators to use their current stores of Dornier 1500 shock rated electrodes to the new 2,000 shock specifications and to refurbish these electrodes with Energy Four for use at the newly approved specification of 2,000 shocks.

Energy Four's claims regarding the lack of physical differences between Dornier's 1500 and 2000 shock electrode may not have been fully substantiated by Energy Four, but Dornier failed to show that these claims were actually false. Likewise, the court could not say that Energy Four's claims that it gave precise attention to Dornier's PMA specifications were substantially likely to be proven false. The PMA specifications and Dornier's published specifications, which Energy Four did possess, did not identify the coefficient of hardness tolerance range that Dornier maintains distinguishes its 2000 shock electrode from earlier versions. Dornier's claims regarding the safety risk of glue-bonded refurbished electrodes were also unsubstantiated, but Energy Four did not carry its burden of showing these claims substantially likely to be proven false.

### 2. Claims Allegedly Misleading

Statements not actually false may still be actionable as misleading. When the representations are allegedly misleading, rather than false, "the statute demands only proof that the plaintiff provide a reasonable basis for the belief that the plaintiff is likely to be damaged as a result of the false advertising." Johnson & Johnson v. Carter–Wallace, Inc., 631 F.2d at 190. Unfortunately, the case law does not establish a minimum standard of proof for a tendency to mislead. Circumstantial evidence may be sufficient for injunctive relief. PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc., 818 F.2d at 271. A showing that a small but "not insubstantial number of consumers were clearly misled" may also be sufficient. Coca–Cola Co. v. Tropicana Products, Inc., 690 F.2d at 317.

While it was unnecessary to examine consumer reaction to representations the court found to be actually false, *PPX Enterprises*, 818 F.2d at 272, such an inquiry was necessary to determine whether the parties were likely to prevail on their claim that the remaining representations were misleading. Evidence of consumer reaction usually consists of surveys and market research, but other reliable evidence may be given substantial weight. *American Home Prods. Corp. v. Johnson & Johnson*, 577 F.2d at 167. *See, e.g., American Brands, Inc. v. R.J. Reynolds Tobacco Co.*, 413 F.Supp. at 1357 (expert testimony, if not frivolous, may be considered). Neither party produced such evidence sufficient for the court to conclude that it was substantially likely to establish at trial that the representations, other than those identified above as likely to be proven false, had a "tendency to mislead." The court expresses no opinion as to how the trier of fact will dispose of these additional claims.

### B. *Irreparable Harm*

Proof of falsity is sufficient to sustain a finding of irreparable injury for purposes of a preliminary injunction. *Tambrands, Inc. v. Warner–Lambert Co.*, 673 F.Supp. 1190 (S.D.N.Y.1987). Once a plaintiff has shown that the defendant's representations are false or tend to mislead the public so as to affect their purchasing decision, the likelihood of injury can be demonstrated by showing that the parties are competitors. *Johnson & Johnson v. Carter–Wallace, Inc.*, 631 F.2d at 190. When an advertisement makes a misleading comparison to a specifically identified competing product, the value of the competing product is necessarily diminished in the mind of the consumer and irreparable injury may be presumed. *McNeilab, Inc. v. American Home Products Corp.*, 848 F.2d 34, 38 (2nd Cir.1988) (defendant falsely implied that Advil was as safe as Tylenol in all respects). Misleading comparative claims deprive a plaintiff of a legitimate competitive advantage and reduce a consumer's incentive to purchase the plaintiff's product. *Id.* Given the intense and direct competition between the parties, it is clear that the court may presume that any false or misleading statements made by either party will injure the other.

Beyond these inferences of irreparable harm, plaintiff produced evidence that since publication of the brochure, Energy Four sales have declined by over fifty percent. Energy Four claims that this decrease in sales has forced the company to lay off over one-half of its production staff, that the cost of this lawsuit has exhausted all of Energy Four's capital, and that Energy Four is in "imminent danger" of being forced out of business. Dornier produced no evidence that a preliminary injunction would possibly harm Dornier more than any potential injury to Energy Four.

Because both parties sought only equitable relief at the hearing, neither party needed to demonstrate that potential customers were actually deceived by the challenged representations. Given the limited number of potential customers, evidence that a small number of customers were actually deceived is more probative than it might be in other cases.

Dornier has challenged Energy Four's characterization of Energy Four's decline in sales. The challenge is immaterial. A plaintiff who can prove actual lost sales is entitled to an injunction even though the decline in his sales is mostly attributable to factors other than his competitor's allegedly false or misleading representations. *Coca–Cola*, 690 F.2d at 316. Because detailed proof of individual lost sales goes to the issue of damages, it is not a prerequisite for equitable relief. *Id.*; *Parkway Baking*, 255 F.2d at 648. A plaintiff "need not even point to an actual loss or diversion of sales." *Johnson & Johnson v. Carter–Wallace*, 631 F.2d at 190–91. Thus, when a plaintiff seeks an injunction, as opposed to money damages, he "need not quantify the losses actually borne." *Id.*, at 189. The court notes that Dornier failed to introduce probative evidence of any decline in its own sales.

### C. *Other Factors*

Consumer deception, by its very nature, is against the public interest. *Tele-*

*dyne Indus., Inc. v. Windmere Prods. Inc.*, 433 F.Supp. 710, 740–741 (S.D.Fla. 1977); *S K & F Co. v. Premo Pharmaceutical Labs.*, 625 F.2d 1055, 1067 (3rd Cir. 1980). Finally, it is clear to the court that issuing a preliminary injunction to prevent the further dissemination of claims likely to be shown false or misleading at trial will not impose an unfair hardship on either party, and if there is any risk of potential harm, it is shared by both parties.

## IV. CONCLUSIONS OF LAW

Dornier Medical Systems, Inc., and its employees, agents and representatives are ENJOINED from making further statements or representations concerning an alleged catastrophic failure of a refurbished electrode. Dornier and its employees, agents and representatives are further ENJOINED from distributing the "Customer Report: Refurbished Electrodes" brochure containing statements about an alleged catastrophic failure.

Dornier is also entitled to a preliminary injunction. Energy Four, Inc. and its employees, agents and representatives are ENJOINED from continuing to make, communicate, or distribute the representations found likely to be proven false.

## V. FIRST AMENDMENT CONCERNS

 Dornier argues that it should not be enjoined from making statements concerning the catastrophic failure of an Energy Four electrode because these statements are entitled to first amendment protection. Dornier's statements are not entitled to first amendment protection because they are untrue. While commercial speech is entitled to some protection, deceptive or misleading advertising disserves the aims of the first amendment. *In re R. M. J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982). Misleading advertising is subject to restraint, and false advertising may be prohibited entirely. *Id.*; *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d at 43. Dornier's argument is without merit.

## VI. NOTICE TO CUSTOMERS

 A district court has broad powers in equity to direct parties who have engaged in unfair competition to take affirmative steps to eliminate possible consumer confusion. *Alpo Pet Foods, Inc. v. Ralston Purina Co.*, 720 F.Supp. 194 (D.D.C. 1989) (both parties required to issue corrective releases), *rev'd on other grounds*, 913 F.2d 958 (D.C.Cir.1990); *Bunn Co. v. AAA Replacement Parts Co.*, 451 F.2d 1254, 1269–70 (5th Cir.1971); *Upjohn Co. v. Riahome Corp.*, 641 F.Supp. 1209, 1226 (D.Del. 1986). Because of the intense and direct competition between the parties, the public health concerns involved, and the conclusion that both parties are entitled to injunctive relief, the court determines that issuance of a corrective release is justified. After supplemental briefing by the parties, the court DIRECTS that the notice attached to this order as Appendix A be distributed to all Energy Four and Dornier customers, the cost to be shared equally by the parties.

## VII. PLAINTIFF'S MOTION FOR SANCTIONS

On September 12, 1990, the day of the hearing on the cross motions for preliminary injunction, plaintiff moved the court for sanctions for defendant's failure to comply with discovery ordered by Magistrate Judge Strother. Plaintiff asked the court to sanction defendant by prohibiting defendant from presenting his counterclaim and motion or injunctive relief until it complied with the magistrate's order. Plaintiff raised this issue at the opening of the hearing but the court declined to hear the matter at that time and instructed plaintiff to seek a hearing before Magistrate Judge Strother if plaintiff wanted a ruling on the issue before the hearing on the preliminary injunction motions. Plaintiff elected to proceed with the hearing.

Defendant argues that the court should deny plaintiff's motion for sanctions as moot, claiming that plaintiff withdrew the motion by electing to proceed with the preliminary injunction hearing. Plaintiff denies that its motion was withdrawn and

again asks the court to prohibit defendant from proceeding on defendant's counterclaim and motion for permanent injunctive relief until defendant complies with the magistrate's discovery order.

As indicated at the hearing for preliminary injunction, the court believes that plaintiff's motion should be referred to Magistrate Judge Strother. The Clerk of Court is DIRECTED to submit plaintiff's motion for sanctions to Magistrate Judge Strother to determine whether defendant has complied with the magistrate's discovery order and what sanctions, if any, are appropriate.

## VIII. CONCLUSION

Plaintiff's motion for preliminary injunction is GRANTED. Defendant's motion for preliminary injunction is GRANTED. The parties are INSTRUCTED to share the cost of distributing the corrective notice contained in this order to all users of lithotripsy machines capable of using Dornier electrodes. Plaintiff's motion for sanctions is REFERRED to Magistrate Judge Strother.

SO ORDERED.

## APPENDIX A

*Notice to Operators of Lithotripsy Machines in the United States sent pursuant to an Order of the United States District Court for the Northern District of Georgia by Dornier Medical Systems, Inc., and Energy Four, Inc.*

Energy Four, Inc. filed suit against Dornier Medical Systems, Inc. in the United States District Court for the Northern District of Georgia, contending that Dornier Medical Systems, Inc. had circulated materially false and/or misleading information concerning Energy Four's refurbished electrodes. Dornier Medical Systems, Inc. counterclaimed, contending that Energy Four, Inc. had circulated materially false and/or misleading statements concerning its own products and concerning certain facts regarding Dornier Medical Systems, Inc.'s electrodes. An evidentiary hearing was held before the court on cross motions for preliminary injunctions during September of 1990. After considering the motions, the court ordered the parties to send this notification to all operators of lithotripsy machines in this country which can utilize Dornier Medical Systems, Inc.'s electrodes.

### I.

There was absolutely no evidence adduced at the hearing by Dornier Medical Systems, Inc. that there has ever been a catastrophic failure of an Energy Four refurbished electrode, as that term is ordinarily understood, contrary to assertions made by Dornier Medical Systems in a brochure circulated during the spring of 1990.

It was said in the brochure circulated by Dornier Medical Systems that there had been a catastrophic failure due to problems with the positioning ring on a refurbished electrode. On that subject the evidence showed only two or three instances of a failure of the glue bond on Energy Four refurbished electrodes but no patient injury or damage to equipment occurred on account of these failures.

The parties' respective expert witnesses gave conflicting testimony as to the relative effectiveness of Energy Four's modifications to prevent ring slippage after refurbishing. The court found that the opinions given by the experts were not based on scientifically reliable studies. The court found the experts to be well qualified, but, because of its severe misgivings about the size and integrity of the samples of electrodes tested, the court was unable to draw factual conclusions from their studies.

There was absolutely no evidence adduced at the hearing that any patient has been harmed on account of having been treated with an Energy Four refurbished electrode, nor was any evidence adduced that any generator or other part of a lithotripsy machine has been seriously damaged on account of the use of Energy Four refurbished electrodes.

## II.

At the hearing, both sides produced testimony of experts supporting or rebutting the functional interchangeability of new Dornier electrodes with Energy Four electrodes as well as the differences and similarities between the old Dornier 1500 shock electrodes and the new Dornier 2,000 shock electrodes. Here too, because of the court's severe misgivings about the size and integrity of the sample of electrodes that were tested, the court was unable to resolve these disputes at the hearing.

## III.

The court found that Energy Four, Inc. had made a number of assertions that the Food and Drug Administration (FDA) had "approved" its refurbished electrodes. This appeared to be materially untrue.

In fact, an FDA employee told Energy Four that its refurbishing services do not require FDA approval, provided that Energy Four does not take title to the electrodes it refurbishes and, further, provided that it returns the electrodes to the original Dornier specifications approved by the FDA. The FDA has not actually determined that Energy Four returns electrodes to the approved specifications. Accordingly, the FDA has expressed no view on the efficacy, quality or safety of Energy Four electrodes, either positively or negatively. The FDA has conducted an on-premises investigation of Energy Four's operations but as of this date has issued no report concerning the inspection.

## IV.

Energy Four, Inc. represented to the market that Dornier 1500 shock electrodes could be refurbished and used in conformance with FDA approval for 2,000 shocks at 18kv. In fact, these electrodes were being used outside the United States for that number of shocks. Old Dornier 1500 electrodes, however, were never approved by the FDA for 2,000 shocks, contrary to the representations of Energy Four, Inc. Dornier electrodes with blue positioning rings meet the FDA specifications for 2,000 shocks and may lawfully be refurbished for that number of shocks if the refurbished electrode meets the approved specifications. While some white ring 1500 shock electrodes were manufactured to the same specifications, they were approved for sale only at a 1500 shock life. Whether or not there is a real difference between the 1500 and 2,000 shock electrodes, there is a legal difference. An Energy Four refurbished electrode is exempt from the FDA's application and approval requirements only when it is refurbished to the specifications and shock life approved for that electrode.

## V.

A number of consumers of electrodes for lithotripsy machines have never used Energy Four refurbished electrodes or electrodes refurbished by any other company, either out of natural caution, or on account of limited on-premises testing, or on account of possible technical difficulties in the actual operation. The court noted, however, that since its beginning, Energy Four, Inc., has refurbished between 15,000 and 20,000 electrodes, the vast majority of which seem to have been used by consumers without even anecdotal evidence of clinical catastrophic failure.

## VI.

THE COURT EXPRESSES NO OPINION ON THE RELATIVE MERITS OF NEW AND REFURBISHED ELECTRODES OR ON WHETHER OR NOT IT WOULD BE WITHIN THE STANDARD OF CARE PREVAILING IN YOUR COMMUNITIES TO USE REFURBISHED ELECTRODES. IT ONLY DIRECTED THAT THIS NOTICE BE SENT SO THAT CERTAIN REPRESENTATIONS MIGHT BE CORRECTED AND SO THAT THE CONSUMING PUBLIC MIGHT HAVE SOME RELIABLE INDICATION CONCERNING THE EVIDENCE ADDUCED AT THE HEARING ON THE MOTIONS FOR PRELIMINARY INJUNCTION.